CUTLER v. ROANOKE RAILROAD AND LUMBER CO.

(Filed June 5, 1901.)

1. CANCELLATION OF INSTRUMENTS — *Fraud — Deed — Sufficiency of Evidence—Fraud in Treaty—Fraud in Factum—Contract.*

   Evidence in this case as to fraud in making a deed was sufficient to submit to the jury.

2. EVIDENCE—*Competency—Parol Evidence—Deeds—Fraud.*

   Evidence to vary and contradict the terms of a deed is competent upon the question whether there was fraud in making the deed.

ACTION by J. M. and J. A. Cutler against the Roanoke Railroad and Lumber Company, heard by Judge *T. A. McNeill* and a jury, at Fall Term, 1900, of the Superior Court of WASHINGTON County.    From a judgment for the plaintiffs, the defendant appealed.

*H. S. Ward,* for the plaintiffs.
*A. O. Gaylord,* for the defendant.

FURCHES, C. J. This is an action to recover damages for trespass by defendant on the land of the plaintiff, for timber cut and removed from said land and to vacate a deed dated the 17th of March, 1899, or to have it corrected.

It appeared on the trial and was admitted by all parties, that the plaintiff had conveyed all the timber on the land embraced in the deed of the 17th of March, 1899, to the defendant, by deed dated 28th February, 1887, of a size above 13 inches diameter at the stump; and that the time in which defendant was to cut and remove said timber had not expired by some months. The allegation of the plaintiff is that on the 17th of March, 1899, one Freeman, agent of the defendant came to him in the store of one Bowen, and stated to him that since the date of the first deed, 28th February, 1887, other timber on the land had grown to thirteen inches and proposed to buy that growth; or, in other words, to buy all the timber on said land above 13 inches; that defendant did not want any further time in which to get said timber off the land —said that it would all be taken off by June, which was within the time named in the original deed. The original deed of February, 1887, authorized the defendant to put such tramroads on said land as might be necessary to remove the timber therefrom.

The plaintiff alleges that the contract was to sell defendant the growth of the timber since the date of the first deed, to 13 inches, for $25.00, and that this was the only contract that was made. The case rests on the plaintiff's testimony, which is as follows:

"The bargain between me and Mr. Freeman, the defendant's agent, for the sale of the timber under the deed of March 17, 1899, was made at Horace Bowen's store. Free-

man said that the company would cut the timber I had sold to it by deed of June 13, 1887 (which was same sold in last deed before the time went out on June 13, 1899), and that the company didn't want any more time, but that there was a lot of timber on the land that had grown up over thirteen inches at stump since that deed was executed, that they could not cut under that deed, and that the company wanted to buy the growth that had grown up since June 13, 1887. I thought they would break it to pieces in cutting the other, so I agreed to sell it. I told him I would not sell him any more time on the other timber because he wouldn't offer me as much as he was offering others in the neighborhood. He said all right he didn't want anything but the growth, as he already had the balance. When we bargained, I went home to get my wife to sign the deed. It was about one-half or three-fourths of a mile. He went along with me to where the log was across the path, where he could not pass. He was in a buggy. I walked. I left him at the log to write the deed while I went to the house for my wife. When I got back he had the deed written. It was late in the evening, the sun was about an hour high. His horse was so restless he wouldn't be still a minute. He said to me, 'Make haste and sign it; it is late and I am in a great hurry. I've got to go to Washington to-night. This horse hasn't got sense enough to stand still.' My son was off some distance cutting wood. He handed me the deed to sign and asked me if I wanted to read it. I told him that if it was like the bargain he made it was all right. He said it was just as the bargain was. That he would have all the timber cut off by June and before. I thought he was telling me the truth, and I trusted to his honesty. He paid me only $25.00 for the timber passed in this deed and didn't read it. I can not read good. I didn't have my glasses and when I tried to read without them the lines ran together. I can read print better than writing. The

CUTLER *v.* R. R. & LUMBER CO.

timber is described in the printed part of the deed. I can read the words of the printed part of the deed as the counsel moves his pencil to them, but the lines at once run together when he stops (council here took the deed, pointing with his pencil to portion of it and witness's statements were in reference to the principal portions of the paper). Freeman was Notary and took my acknowledgment and examination of wife.

"I thought when I signed the deed it did not convey all my timber, and was misled and induced to sign it by the statement of Freeman that it was as we bargained."

The Court thought this testimony sufficient evidence of fraud to submit the question to the jury, and this is the question presented by the appeal.

Frauds affecting the validity of deeds are of two kinds—fraud in the factum, and fraud in the treaty. This distinction, though not as material now as formerly, is still material in some cases. *Medlin v. Buford,* 115 N. C., 260. Besides the importance of the distinction pointed out in *Medlin v. Buford,* it was important before the junction of legal and equitable jurisdiction in the same Court, to determine the jurisdiction, as courts of law had jurisdiction of frauds in the factum, but not of frauds in the treaty which were cognizable alone in courts of equity. This made it important to determine, before commencing the action, whether it was fraud in the factum or fraud in the treaty, as the proper Court in which to bring the action depended on this distinction. And while the distinction is important, it is not of that importance that it formerly was, as one is sure now to get into the right Court, if there is fraud whether in the factum or in the treaty. In this case, while there may be some slight evidence of fraud in the factum—such as the unsuitable place where the deed was executed, the apparent haste with which it was done, the remarks of defendant's

CUTLER v. R. R. & LUMBER CO.

agent to hurry and sign the deed—that his horse did not
have sense enough to stand; that it was then late and he had
to go to Washington that night, a distance of 18 miles. Be-
sides, it seems to us that Freeman was doing a little too
much. He was agent of the defendant company and an offi-
cer of the law. When the deed was signd he moved "the
previous question" and by taking the acknowledgment and
privy examination, undertook to "lay the matter on the
table." We do not say that he could not in law take this
acknowledgment and privy examination, but these things,
taken in connection with the fact that the deed was not read
to the parties making it, is some evidence we think of fraud
in the factum.

But leaving out of the case these suspicious circumstances
we have just stated, it seems to us to be a case that should have
gone to the jury upon the evidence of fraud in the *treaty*.
In the case of *McArthur v. Johnson,* 61 N. C., 317, the Court
held that plaintiff could not recover, and that was a case very
much like this, except there was no question in that case but
what the plaintiff could read. In this case the evidence
leaves the question whether plaintiff could read in doubt.
And if this was a material question in the case it should have
been left to the jury. The case of *McArthur v. Johnson* was
brought in the Superior Court of *law* before it had equitable
jurisdiction, and the Court held that it was not a case of
fraud in the *factum,* and the plaintiff could not recover. But
in the discussion of the case the Court lays down the distinc-
tion between fraud in the factum and fraud in the treaty;
and while the Court did not decide that that case was a case
of fraud in the treaty it seems to us that the definition given
in the discussion of the case shows that it was. And the same
doctrine is held in *Gant v. Hunsucker,* 34 N. C., 254; 55
Am. Dec., 408, while the more recent case of *Medlin v. Bu-
ford,* 115 N. C., 260, which seems to be put largely on *Mc-*

128——31

*Arthur v. Johnson,* clearly shows that this case is one of fraud in the treaty, if plaintiff's evidence is to be believed; and we have nothing to do with that, as it is purely a question for the jury.

In *Medlin v. Buford,* the plaintiff signed a paper upon the representation of Davis that it was a power of attorney authorizing him to raise $1,000, to invest for her benefit, at a profit of $25 per month. The plaintiff in that case could read, but did not read the deed; was imposed upon by the false representation of Davis as to the *contents* of the deed, and the Court held that this was not a fraud in the *factum,* and as third parties who were innocent of the fraud had become interested, the plaintiff could not recover. But it is distinctly held that it was a fraud in the *treaty,* and would be declared void as to Davis, and also as to Mrs. Buford, if she or her attorney (Mr. Cutler) *had knowledge of the fraud.*

The distinction between fraud in the factum and fraud in the treaty seems to be very narrow, but still it exists and it seems still important that it should be observed as in the case of *Medlin v. Buford.*

While it is important to observe these ancient landmarks and to give force and validity to the doctrine of fraud as applied to executed contracts—to deeds—it should not be lightly done. Misrepresentations in the treaty as to location, boundaries, quality, value, etc., of which the other party had notice, or might have had knowledge by reasonable diligence, will not be heard by courts of law or equity to invalidate deeds. If this were so, it would seem that no man's title would be safe. Parties entering into solemn contracts, such as deeds, must use ordinary prudence—must examine matters open to them at the time of executing their deeds, or they will not be heard to complain. *Lytle v. Bird,* 48 N. C., 222; *Saunders v. Hatterman,* 24 N. C., 32; 37 Am. Dec.,404.

In this case it appears from the deed of the 28th of Febru-

ary, 1887, that plaintiff sold and conveyed to defendant all the timber on a certain tract of land containing ninety acres, above 13 inches at the stump, with the privilege of establishing tram-road across said land to be used in removing said timber. In the deed of the 17th of March, 1899, he conveys all the timber above 12 inches at the stump and conveys the fee-simple in all the land covered by these roads. And extends the time to remove the timber to one year from the 17th of March, which would have been out at an earlier period.

If the plaintiff's statement of the contract of the 17th of March, 1899, be true, the changes contained in the deed as drawn by Freeman and signed by plaintiff are materially different; and as this deed was not read by plaintiff (as he says) because he could not read it without his spectacles, which he did not have, but was signed by him, relying on the statements of Freeman "that it was drawn just as the contract was," was a fraud in the treaty upon the plaintiff and should have been submitted to the jury.

If the plaintiff had required it to be read and Freeman had read it falsely it would have been a fraud in the factum. *McArthur v. Johnson, Medlin v. Buford, supra.*

There were objections to the plaintiff's evidence as to the terms of the contract, upon the ground that they tended to vary and contradict the deed. This would have been so if the deed had been established as the deed of the plaintiff   But when that was the very question at issue, and when it was necessary to do so to establish the alleged fraud, it was competent for that purpose. And after a careful examination, we find no substantial error, and the judgment is

Affirmed.

DOUGLAS, J., concurring.   I can not concur in the contention of the defendant, that because two men are at arm's

CUTLER *v*. R. R. & LUMBER CO.

length, as all men generally are, unless they occupy some fiduciary relation to each other, one can safely perpetrate a fraud upon the other.    This rather novel doctrine seems to be based upon the idea of contributory negligence on the part of the plaintiff, which, concurring with that of the defendant, becomes the proximate cause of the fraudulent result. This application of the doctrine of contributory negligence is new to me; but even if it were admissible, it could not be a defence in the present action, because actual fraud is always wilful.    Even in actions sounding in damages the defense of contributory negligence is never available against wilful injury.    Then why should it be a defence against wilful fraud ?    I will readily admit that if the negligence of the plaintiff had enabled the defendant to perpetrate a fraud upon a third party who was himself innocent of fraud or negligence, he could not recover from such innocent party. Such a case is far different from the one presented to us in the opinion of the Court.

A man might be negligent in walking in the middle of the street on a dark night, and such negligence might excuse the driver of a wagon for unintentionally running into him, but it would be no excuse for robbery.    The doctrine that mere negligence puts a man beyond the pale of the law, can never receive my assent.

The defendant relies upon the case of *Dellinger v. Gillespie,* 118 N. C., 737, the essential point in which was the fact that the defendant discovered the alleged fraud *before the work was commenced,* and yet permitted the plaintiff to proceed and put up the lightning rods without objection.    The Court said that such conduct was a waiver of the alleged fraud if it ever existed; and that equity would not permit a man to accept work performed after he had full knowledge of all the facts, and then refuse to pay for it.

It is true in that case the Court also said that the defendant

was guilty of negligence, and cited *Boyden v. Clark,* 109 N. C. 664, 669, a case which, I respectfully submit, furnishes no foundation whatever for the contention of the defendant in the case at bar. Some isolated sentences in the opinion, considered without regard to the essential facts of the case, might offer some show of authority; but the case itself, taken as a whole, fails to do so. The defendant, Clarke, bought the equitable interest of one Sherrill, who held a bond for title from James Harper. Clarke subsequently paid Harper the remainder of the purchase-money, and took a deed from him. The plaintiff, Boyden, who had bought an adjoining tract, sought to hold Clarke responsible for alleged representations of Sherrill, although Clarke was an innocent purchaser, for a valuable consideration, without notice, and held title under Harper, and not under Sherrill. The Court says (109 N. C., page 667): "It would be giving very great latitude to the doctrine of estoppel *in pais* if the mistaken or fraudulent statements of a vendee, occupying land under a contract of sale, were allowed to have the effect of establishing title by estoppel, as against the original vendor and the assignee of the original vendee, after the vendor had performed his contract by conveying to the assignee, *both grantor and grantee being ignorant of the fact that any misrepresentation had been made.*"

That case as thus stated in the opinion itself furnishes no authority for the doctrine now contended for by the defendant, that, as between the original parties, mere negligence is a defense for wilful fraud.

To the contrary may be cited a practically unbroken line of authorities. Fetter on Equity, sec. 87, page 136, says: "But no obligation rests on him to investigate or verify the representations, to the truth of which the other party to the contract, with full means of knowledge, has deliberately pledged his faith. In a Court of Equity no man can complain that

another has too implicitly relied on the truth of what he himself has stated."

Beach on Mod. Eq. Jur., sec. 95, says: "A false representation of one of the parties to a contract does not put the other on inquiry as to its truth. Every contracting party has an absolute right to rely on the express statement of an existing fact, the truth of which is known to the opposite party and unknown to him, as the basis of a mutual agreement; and he is under no obligation to investigate and verify statements to the truth of which the other party to the contract, with full means of knowledge, has deliberately pledged his faith."

Story's Eq. Jur., sec. 154, says: "The danger of setting aside the solemn engagements of parties when reduced to writing, by the introduction of parol evidence, substituting other material terms and stipulations, is sufficiently obvious. But what shall be said where those terms and stipulations are suppressed or omitted by fraud or imposition? Shall the guilty party be allowed to avail himself of such a triumph over innocence and credulity to accomplish his own base designs? That would be to allow a rule introduced to suppress fraud to be the most effectual promotion and encouragement of it. And hence courts of equity have not hesitated to entertain jurisdiction to reform all contracts where a fraudulent suppression, omission, or insertion of a material stipulation exists, notwithstanding to some extent it breaks in upon the uniformity of the rule as to the exclusion of parol evidence to vary or control contracts; wisely deeming such cases to be a proper exception to the rule, and proving its general soundness."

Bispham Prin. Eq., sec. 202, says: "There is, indeed, a distinction between deeds and other instruments which a man intends to execute, though his intention may be brought about by fraudulent means, and those which he has no intention to

execute, but executes under the impression that the instrument is of a different character from what it actually is, or, in other words, executes the wrong paper.    In the latter case the instrument is absolutely void, and the law above stated in relation to voidable instruments would, in general, not apply."

Again the learned author says, in section 207:  "A man who is dealing with another has a right to rest upon an assertion of a *fact* made by the latter; but he has no right to rely upon the latter's opinion, unless, indeed, he is an expert, in which case the parties do not deal upon equal terms, and the ordinary rule does not apply."

Neither space nor time will permit an examination of the numerous authorities cited by these different authors.    I will quote but two:

In *Redgrave v. Hurd,* 20 Ch. Div. 1, the celebrated Sir George Jessel, Master of the Rolls, says:    "Nothing can be plainer, I take it, on the authorities in equity, than that the effect of false representation is not got rid of on the ground that the person to whom it was made was guilty of negligence."

In *Sutton v. Morgan,* 158 Pa. St., 204, 218; 38 Am. St. Rep., 841, 844, the Court says:  "It is said that Williams should have inquired for himself, and that his opportunities of obtaining information were just as good as those of Morgan.    This may be.    Prudence should have led him and his 'financial man' Sutton to test the truth of the glowing statements made by Morgan and Gloss, but it did not.    They fell easily into the trap which was set, with some skill and some effrontery, for them; but their neglect, or want of prudence, can not justify the falsehood or fraud of those who practiced upon their credulity.    The doctrine of contributory negligence can not be invoked by the defendants to save them from liability for misleading their victim.    They must stand or

CUTLER *v.* R. R. & LUMBER CO.

fall on the truth, and good faith, of the representations that led to the sale." This opinion is particularly striking on account of its conclusion. While granting the prayer of the plaintiff for the rescission of the contract, the return of the money paid and the cancellation of the mortgage, it concludes as follows: "For his gross carelessness the plaintiff ought to lose his costs. No bill of costs will be taxed for the plaintiff."

There is an essential difference between actual misrepresentation and the mere concealment of material facts of which both parties had equal opportunities of information; but the latter principle I am not now discussing. A common instance of correcting a written instrument which both parties might have read, is where a deed absolute in form is construed to be a mortgage.

It seems to me that every principle of equity that would grant relief from fraud in the treaty, would apply with even greater force to fraud in the *factum.*

Whether there was sufficient *evidence of fraud,* in the case at bar to go to the jury, is an entirely different question; but even on that I concur with the Court.

CLARK, J., concurring in result. The charge here is fraud in the *factum,* in the execution of the deed after grantor consented to sign it, and not in the preliminary representations or treaty. The complaint alleges that the plaintiff agreed with one Freeman, agent of the defendant, to sell a part of the timber, whereupon the said agent of the defendant company drew the deed while plaintiff went off to get his wife; that on his return the deed was already drawn up, but plaintiff having left his spectacles, was unable to read it; that he asked Freeman the contents of it, and was assured that it was a conveyance only of the specified timber, and plaintiff, relying upon the truth of such, signed and delivered the deed,

whereas, the timber actually conveyed was all the timber on the land, and the price paid ($25.00) was not one-twentieth in value of the timber conveyed; wherefore, plaintiff charges that the execution of the deed was procured by fraud, and asks that the deed be reformed so as to convey only the timber agreed to be sold, and for recovery of $400, the value of timber already cut, outside of the kind it was agreed the plaintiff was to convey.

The plaintiff introduced evidence in full support of above contention, and, as a further circumstance in corroboration of the charge of fraud, evidence, which was admitted without objection; that when he got back, not having his spectacles, Freeman said to him, "Make haste and sign it; it is late and I am in a great hurry. Iv'e got to get to Washington to-night. This horse hasn't got sense enough to stand still." The plaintiff contends that this, together with the gross inadequacy of price, $500, for $25.00, and the difference between the deed as written, and as it was agreed to be written, and the fact that Freeman told plaintiff that the deed was written as agreed, and knew that plaintiff could not read without his glasses, was evidence to go to the jury to show imposition and fraud by trick and device. As the defendant's exception is for refusal to tell the jury that there was no evidence, this evidence of the plaintiff must be taken as true and in the most favorable aspect for the plaintiff.

Taken as true, no court of equity could refuse the relief asked. The jury found that it was true. The following issues were submitted without objection:

1. Was the deed from J. M. Cutler and wife to the defendant, dated 17th March, 1899, obtained by fraud? Ans. Yes.

2. If so, what was the value of the timber? Ans. $243. The latter evidently meaning from the complaint and judgment, the value of timber cut in excess of what was agreed to be paid.

The defendant asked the following special instructions, which were given with the modification below recited:

1. That if the jury find from the testimony that the plaintiff, J. M. Cutler, when he executed the deed to defendant, on March 17, 1899, could have read it, if he had so desired, and failed to do so, then he is bound by it and can not be heard to say that a fraud was practiced upon him by defendant's agent, S. F. Freeman, by inserting in said deed more timber than said Cutler thought was therein, and more than said Freeman told him was conveyed by it. And if he could by reasonable diligence have ascertained the contents of said deed, it was his duty to do so; and if you find that he failed to do so, by not reading it, you will answer the first issue "No."

2. That from all the evidence, if believed, the plaintiff, J. M. Cutler, could have read the deed of March 17, 1899, before signing it, and could have ascertained thereby what timber it conveyed and his failure to do so, if he did fail, does not relieve him from the operation of said deed, and you will answer the first issue "No."

3. That the deed of June 13, 1887, conveyed all the timber on the land described in the complaint down to 13 inches on the stump to the defendant in fee-simple, and the deed of March 17, 1899, by the plaintiff's admission, conveys the timber on said land down to 12 inches, which had grown to that size since June 13, 1887, and the legal effect of these deeds is to convey all the timber on said land to defendant, and to give defendant the right to enter and cut and remove the same, and you will answer the second issue "Nothing."

These charges were given with this modification to each:

With this modification: "Unless you shall find from the evidence that the company, by its agents, made a false representation as to the contents of the deed, and in reliance on this statement or representation, the agent knowing it to be

false, he (plaintiff) signed the deed, and was defrauded thereby in the respect complained of."

(To this modification the defendant excepts.)

Those instructions were asked by defendant and were the strongest possible presentation of defendant's case. The modification was eminently proper to be submitted to the jury in view of the uncontradicted evidence that plaintiff could not read without his glasses; that Freeman was urging to hurry him up and sign, that his horse would not stand, etc., the evidence tending to show gross inadequacy in price, and that the deed was written differently from agreement, and Freeman's misrepresentation that it was written as agreed. Without holding it illegal, it is proper to say that for the defendant's agent who procured the execution of the deed to take the acknowledgment of the grantor, and the privy examination of his wife, is a practice to be avoided, not followed.

*Dellinger v. Gillespie,* 118 N. C., 737, was correctly decided. It holds that where a grantor negligently fails to read a deed, *no fraud or deceit being shown,* he can not be allowed to contradict its terms by parol evidence by showing that he intended something else.

But here the very gravamen of the complaint is fraud in the factum, the taking advantage of plaintiff's inability to read, the writing it differently from the way it was agreed to be written, the urging plaintiff to hurry up and sign it, knowing he could not read it without going to his house a half-mile off on foot to get his spectacles.

While every presumption is in favor of the "written word," no deed is proof against fraud. Whether this evidence proved fraud was a matter which only a jury could pass upon. In submitting it to that tribunal, which the Constitution says is "one of the best securities of the rights of the people and ought to remain *sacred and inviolable,*" his Honor did only

his duty. There being disputed matters of fact, the plaintiff had an inalienable right to have the truth of the evidence passed upon by a jury of his peers. The misrepresentations here are not as to matters in the treaty, as to which both parties had equal opportunity for examination, but as to the contents of a deed drawn by one of them, which the other could not read without his glasses, and who at the same time was urged to sign at once without going for his glasses. It was exactly as if the same advantage had been taken of a blind man, if plaintiff's evidence is to be believed, and whether it was to be believed or not, no one could decide save a jury, to whom therefore the Court properly submitted it.

Juries may sometimes be prejudiced, but knowing that Judges are "men of like passions," the wisdom of the ages has properly provided that disputed facts shall be passed upon by twelve impartial men drawn from the body of the people, and at once returning to them, with unlimited challenge for favor and a reasonable number of challenges without cause assigned. Besides, if the verdict shows bias, or mistake, or is upon insufficient evidence, the Judge can set it aside without assigning cause. *Hardy v. Hardy,* at this term. There is thus every protection. But if the Judges take to deciding the facts, there is no protection against bias, or negligence, or incompetence, and no power to set aside their verdict. Every consideration therefore demands that the evidence should be submitted to the jury, unless it is clear that there is not a *scintilla* in favor of him upon whom rests the burden, and that upon the evidence only one conclusion (and that adverse to the plaintiff) can be drawn. The Judge below had power to set the verdict aside if he doubted the sufficiency of the evidence, and submit the issue to another jury. That is the proper remedy. It is not for this Court upon this evidence, to adjudge that the evidence was not sufficient to prove fraud, and thus deprive the plaintiff altogether of a right to trial by jury.

MONTGOMERY, J., dissenting. The plaintiff and his wife in 1899 executed to the defendant a deed, on the face of which there is conveyed all the timber on the land described in the deed. This action is brought to have the deed set aside and declared void, except as to the growth of timber to a certain size since 1887, on the ground of fraud; and also for the recovery of $400, the alleged value of timber, which the defendant is alleged to have wrongfully cut and removed from the land by virtue of the provisions of the deed. The fraud alleged is set out in allegation 3 of the complaint, and is as follows:

"3. That the defendant company, as this plaintiff is informed and believes and avers, claimed the right to go upon said land and remove said timber, by virtue of a deed executed to the said defendant by J. M. Cutler, registered in Book 41, page 236, which deed the plaintiff alleges was obtained by the defendant company by fraud, in the manner and method as follows: The said company, through its agent, S. F. Freeman, on the 17th day of March, 1899, proposed to the said J. M. Cutler to buy the timber on said land which had grown to merchantable size since June, 1887, and expressly stated that he did not want to buy any other, and for said timber offered to said J. M. Cutler the sum of $25, which offer said Cutler accepted and authorized said Freeman to draw deed for said timber, which had grown up since 1887, as aforesaid, and no other, and left the said Freeman alone to write said deed, and on his return found the deed filled out and ready for signing. That the said J. M. Cutler was unable to read the said deed at that time and did not read it, but asked the said Freeman as to the contents of it, and he, the said Freeman, expressly stated that the deed conveyed only the timber that had grown up since 1887, and did not convey any other, nor any rights to any other, and the said Freeman so read the deed to said Cutler, from which it

CUTLER *v.* R. R. & LUMBER CO.

appeared that no interest passed except as above stated, and relying upon that representation and reading and statement of said Freeman, said Cutler signed and delivered said deed."

The allegation of fraud is both in the *factum* and in the inducement or treaty. In *McArthur v. Johnson,* 61 N. C., 317, it was said by the Court: "Another instance (fraud in the factum) is afforded by the case of a deed executed by a blind or illiterate person, where it has been read falsely to him upon his request to have it read." Upon the trial, however, the plaintiff's own testimony disproved the allegation of fraud in the *factum,* and in the argument before this Court the plaintiff's counsel abandoned that view of the case and relied entirely upon fraud in the treaty.

I will now consider that aspect of the case. The evidence of the plaintiff consisted of his own testimony alone, which was as follows:

"The bargain between me and Mr. Freeman, the defendant's agent, for the sale of the timber under the deed of March 17, 1899, was made at Horace Bowen's store. Mr. Freeman said that the company would cut the timber I had sold to it by the deed of June 13, 1887 (which was same sold in last deed before the time went out on June 13, 1899), and that the company didn't want any more time, but that there was a lot of timber on the land that had grown up over 13 inches at stump since that deed was executed; that they could not cut under that deed, and that the company wanted to buy the growth that had grown up since June 13, 1887. I thought they would break it to pieces in cutting the other, so I agreed to sell it. I told him I would not sell him any more time on the other timber, because he wouldn't offer me as much as he was offering others in the neighborhood. He said all right, he didn't want anything but the growth, as he already had the balance. When we bargained, I went home to get my wife to sign the deed. It was about one-half or

three-fourths of a mile. He went along with me to where a log was across the path, where he could not pass. He was on buggy. I walked. I left him at log to write the deed while I went to house for my wife. When I got back he had the deed written. It was late in the evening, sun about an hour high. His horse was so restless he wouldn't be still a minute. He said to me, "Make haste and sign it; it is late and I am in a great hurry. I've got to go to Washington to-night. This horse hasn't got sense enough to stand still." My son was off some distance cutting wood. He handed me the deed to sign and asked me if I wanted to read it. I told him that if it was like the bargain we made, it was all right. He said it is just as the bargain was. I will have all the timber cut off by June and before. I thought he was telling me the truth, and I trusted to his honesty. He paid me only $25 for the timber, passed in this deed and didn't read it. I can not read good. I didn't have my glasses, and when I tried to read without them the lines run together. I can read print better than writing. The timber is described in the printed part of the deed. I can read the words of the printed part of the deed as the counsel moves his pencil to them, but the lines at once run together when he stops. (Counsel here took the deed, pointing with his pencil to portions of it and witness' statements were in reference to the principal portions of the paper.) Freeman was Notary, and took my acknowledgment and examination of wife.

"I thought when I signed deed it did not convey all my timber, and was misled and induced to sign it by the statement of Freeman that it was as we bargained."

Freeman, as a witness for the defendant, testified, that the deed was drawn according to the agreement; and Jordan, another witness for the defendant, said that the plaintiff told him that "Freeman offered to read the deed, or to let him (plaintiff) read it; that he did neither, and did not know its

contents." But the evidence of the defendant is of no consequence in this appeal, and is only referred to in fairness to
the defendant. The admission of the plaintiff's evidence in
reference to the treaty leading up to the sale, in plain contradiction of the terms of the deed, and the further admission
of the plaintiff's evidence that he was induced to sign the
deed upon the statement and representation of Freeman, that
only the growth of timber since 1887 was conveyed in the
deed, and the charge of his Honor upon that evidence, are
before us for consideration.

The transaction was between parties who were dealing as
strangers, there being no relation of confidence between them.
The deed was drawn by the grantee's agent and handed to
the grantor for his signature and that of his wife. The
grantor, the plaintiff and his wife could both read and write,
and they signed the deed without reading it, or without asking that it be read to them. If a fraud was perpetrated by
Freeman, the agent of the defendant, as is alleged in the
complaint, the plaintiff can not have relief because his execution of the deed under the facts of this case was negligence on his part. *Dellinger v. Gillespie,* 118 N. C., 737.
He should have read the deed, or have had Freeman to do
so. The deed was before him; he had every opportunity to
read it, and there was not only no trick or device practiced
on him to procure his signature, but there was none charged
in the complaint. The plaintiff himself testified: "I thought
when I signed the deed it did not convey all my timber, and
was misled and induced to sign it by the statement of Freeman that it was as we bargained." By his own evidence, the
plaintiff executed this deed, relying as to its contents upon
the statement made by one with whom he was dealing as a
stranger, and not as with one in whose statements he had in
law the right to confide. If the plaintiff has been cheated
it was his own fault, and the fraud, if there has been fraud,

was perpetrated successfully through the plaintiff's own negligence in failing to read the deed.

It was argued here by the plaintiff's counsel that the request made by Freeman to the plaintiff when he handed him the deed—"make haste and sign it; it is late and I am in a great hurry; I have got to go to Washington to-night; this horse has not got sense enough to stand still"—was some evidence tending to prove a trick or contrivance on the part of Freeman to procure the plaintiff's signature to the deed without reading it. In my opinion, it was not sufficient to be submitted to the jury as evidence; and certainly from the plaintiff's own testimony it made no impression upon him, for in his complaint he does not set up that matter as a trick or device to get his signature to the deed, or any other trick or device as we have already seen.

I think there was error.